RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 9210
Telephone: 619/239-4599
Facsimile:  619/234-4599

GREGORY M. NESPOLE
GMN@whafh.com
JANINE L. POLLACK
pollack@whafh.com
RANDALL S. NEWMAN (190547)
newman@whafh.com
KATE McGUIRE
mcguire@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile:  212/545-4677

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EDWARD RINN and RENO CAPPELLI, on behalf of themselves and all others similarly situated, ) ) ) ) | CASE NO. |
| Plaintiffs, ) ) | **CLASS ACTION COMPLAINT** |
| v. ) ) | **DEMAND FOR JURY TRIAL** |
| INTEL CORPORATION, ) ) | |
| Defendant. ) ) | |

CLASS ACTION COMPLAINT

Plaintiffs Edward Rinn and Reno Cappelli ("Plaintiffs"), for their class action complaint, allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF ACTION

1. Plaintiffs assert this class action against Defendant Intel Corporation ("Intel") on behalf persons who purchased or leased an Intel processor with x86-64x architecture (the "Intel Processor"), either as a component of another product or separately.[1] Intel Processors can be found in desktop, laptop, and cloud-based computers, and in servers and phones (cumulatively "Intel Processor Computers"[2] or "IPCs"). Products containing Intel Processors are manufactured by major technology companies such as Lenovo, Hewlett Packard, Dell, Apple, Asus and Acer, in accordance with design specifications prepared by Defendant Intel.

2. Processers are, in effect, the brains of computers. They handle the execution of instructions given by software programs. Given the vast number of instructions involved in virtually every program, processor speed is highly significant to technology consumers. Defendant Intel has long marketed itself on the basis of its processor speed. Computers with processors manufactured by Intel are clearly delineated as such on their packaging and/or marketing materials, because of the impression consumers have of Intel Processors as being an asset.

3. Unfortunately, all Intel Processors are defective because they were designed by Defendant Intel in a way that allows hackers and malicious programs potential access to highly secure information stored on the units in which they are installed. The Intel Processors expose users to two types of security risk (the "Security Risks"), described further herein, which have been dubbed Meltdown and Spectre by the technology community: "Meltdown," because it "melts security boundaries which are normally enforced by the hardware," and "Spectre" because it its

---

[1] The Intel Processors include, but are not limited to, Intel Celeron, Intel Pentium, Intel Core i3, Intel Core i5, Intel Core i7, Intel Core i9, Intel Xeon, Intel Xeon Phi, Intel Atom and Intel Itanium processors.

[2] As used herein, the term "computer" includes not only desktops and laptops, but servers, smartphones, tablets and all other smart devices incorporating computer processor technology.

root cause is speculative execution, and "because it is not easy to fix, it will haunt us for quite some time."[3]

4. To protect themselves from the Meltdown risk, users will have to apply a software patch that will cause to a slowdown in the processor speed of between 5 and 30% (the "Slowdown Problem").

5. There is no complete software patch for the Spectre risk at this time, and it is not presently known if any software patches necessary to fix Spectre will slow processer speed or by how much. A long term solution for the Spectre risk may require the development of new hardware.

6. In short, Defendant has not been able to offer an effective repair to its customers. A patch that dramatically cuts processor performance is not a legitimate solution, nor is any patch that does not fully address the security vulnerability.

7. Defendant has admitted knowing of the design defect giving rise to the Security Risks for at least 6 months, and in fact, knew or should have known of the design defect for much longer. However, it continued to sell and distribute its processors without repair or disclosure of the defect. The Intel Processors it sold and distributed were not of the quality represented, and were not fit for their ordinary purposes.

8. Plaintiffs would not have purchased the Intel Processors had they known of the Security Risks, they would not have paid the prices they paid for the Intel Processors (or for computer devices in which the Intel Processors were a component) that they would be subject to the significant Security Risks as well as a slowdown in speed and thus decrease in quality and value. Plaintiffs have suffered an ascertainable injury, and a loss of money or property as a result of Defendant's wrongdoing.

///

///

---

[3] https://spectreattack.com//#faq-fix (website of Graz University of Technology, on the team which discovered the defects).

**THE PARTIES**

9. Plaintiff Edward Rinn is an individual residing in Fairbanks, Alaska who, on October 30, 2015, purchased an iMac which contains an Intel Core i7 processor, a specific Intel Processor, for $4,099.00. The Intel Processor in his IPC has been exposed to the Security Risks described herein and will be impacted by the Slowdown Problem.

10. Plaintiff Reno Cappelli is an individual residing in Henderson, Colorado who, on July 23, 2015, purchased a Microsoft Surface Pro 3 which contains an Intel i7 processor, a specific Intel Processor, for $1,399. The Intel Processor in his IPC has been exposed to the Security Risks described herein and will be impacted by the Slowdown Problem.

11. Defendant Intel is a Delaware corporation with its principal place of business located at 2200 Mission College Boulevard, Santa Clara, California, 95054. Intel regularly conducts and transacts business in this District, as well as throughout the United States. Intel manufactures, markets, and sells processors used in personal computers and servers.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which Defendant Intel and members of the proposed plaintiff classes, including the named Plaintiffs, are citizens of different states.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Intel has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, and Intel is a corporation subject to personal jurisdiction in this District and, therefore, resides here for venue purposes.

**FACTUAL ALLEGATIONS**

14. Defendant Intel is one of the world's largest manufacturers of computer processors, and has been making the defective Intel Processors for more than 10 years. These processors have been installed in computers and phones made by industry heavy-hitters such as Lenovo, Hewlett Packard, Apple, Dell, Asus and Acer, in servers made by Intel itself and others, and sold directly as

CLASS ACTION COMPLAINT
- 3 -

components so that consumers might install them in other devices, in the belief that they would increase their processing speed. Defendant Intel has sold millions of Intel Processors.

15. On January 2, 2018, it was reported that "a fundamental design flaw in Intel's processor chips has forced a significant redesign of the Linux and windows kernels to defang the chip-level security bug." Leyden, J. et al., *'Kernal memory leaking' Intel processor design flaw forces Linux, Windows Redesign*, The Register, January 2, 2018.[4]

16. On January 4, 2018, it was widely reported that the design defect exposed users to two security vulnerabilities, called "Meltdown" and "Spectre" respectively, both of which exposed users to significant security risks and for neither of which was there a reasonable and adequate solution. Metz, *et al.*, *Researchers Discover Two Major flaws in the World's Computers*, New York Times, January 4, 2018.

17. The Meltdown and Spectre vulnerabilities allow hackers to take advantage of a modern computer processor (or "CPU") performance feature, called speculative execution. Speculative execution attempts to improve speed by executing multiple instructions at once (or even in a different order than when entering the CPU). To increase performance, the CPU **predicts** which path of a branch is most likely to be taken, and will speculatively continue execution down that path even before the branch is completed. If the prediction is wrong, speculative execution is rolled back in a way that is intended to be invisible to software.

18. The design flaw exposes the processor's kernel to vulnerability. A kernel is the most vital software component of a computer, which serves as a go between among programs and computer components, such as the processor and the memory. One of the kernel's main tasks is to prevent data in on program from being read by another when it should not.

19. Meltdown and Spectre risk allows hackers to abuse speculative execution to access privileged memory – including that of the kernel – from a less-privileged user process (such as a malicious app running) on the device.

---

[4]     https://www.theregister.co.uk/2018/01/02/intel_cpu_design_flaw/ (last visited January 4, 2018).

20. Because of the newly-disclosed defect, malicious users may gain access to sensitive data that is supposed to be protected by the kernel, such as passwords, social security numbers, credit card and banking information, and photographs. Significantly, unlike ordinary malware, which runs like applications, hackers exploiting these kernel defects cannot be seen by antivirus software.[5]

21. As detailed below, the software patches for the design defect are wholly inadequate to remedy the harm that is caused. The software "fix' for the Meltdown vulnerability" is expected to reduce processor speed by between 5 and 30%, with some sources predicting the possibility of even greater slowdown. There is no complete software patch for the Spectre vulnerability at this time, and it is not clear whether any of the patches necessary to fix Spectre will slow processers.

**The Defective Intel Processor's Security Risks**

**"Meltdown" Risk**

22. Meltdown is the name given to an exploitation technique known as CVE-2017-5754 or "rogue data cache load." Meltdown risk can enable a user process to read kernel memory.

23. The Meltdown flaw affects virtually every microprocessor made by Intel since 1995. As described on a website set up by Graz Technical University, representatives of which were involved in uncovering the defects:

> Meltdown breaks the most fundamental isolation between user applications and the operating system. This attack allows a program to access the memory, and thus also the secrets, of other programs and the operating system. ***If your computer has a vulnerable processor and runs an unpatched operating system, it is not safe to work with sensitive information without the chance of leaking the information***.

(Emphasis supplied).[6]

24. Unfortunately the fix for Meltdown risk comes at as significant cost in processor performance. As the Register reported:

> Programmers are scrambling to overhaul the open-source Linux kernel's virtual

---

[5] http://nymag.com/selectall/2018/01/intel-chip-security-flaw-meltdown-spectre-what-to-know-explainer.html

[6] https://spectreattack.com/#faq-fix

> memory system. Meanwhile, Microsoft is expected to publicly introduce the necessary changes to its Windows operating system in an upcoming Patch Tuesday: these changes were seeded to beta testers running fast-ring Windows Insider builds in November and December.
>
> Crucially, these updates to both Linux and Windows will incur a performance hit on Intel products. The effects are still being benchmarked, however we're looking at ***a ballpark figure of five to 30 per cent slow down***, depending on the task and the processor model. More recent Intel chips have features – such as PCID – to reduce the performance hit. [...]
>
> Similar operating systems, such as Apple's 64-bit macOS, will also need to be updated – the flaw is in the Intel x86-64 hardware, and it appears a microcode update can't address it. ***It has to be fixed in software at the OS level, or go buy a new processor without the design blunder.*** [7]

25. Meltdown risk thus significantly harms consumers who purchase or lease products with Intel Processors because it slows down processor speed so that it no longer meets the performance specifications promised to consumers at the time of purchase.

26. The slowdown is unavoidable given the way that the Meltdown patch works. As the Register went on to explain:

> The fix is to separate the kernel's memory completely from user processes using what's called Kernel Page Table Isolation, or KPTI. At one point, Forcefully Unmap Complete Kernel With Interrupt Trampolines, aka FUCKWIT, was mulled by the Linux kernel team, giving you an idea of how annoying this has been for the developers.
>
> Whenever a running program needs to do anything useful – such as write to a file or open a network connection – it has to temporarily hand control of the processor to the kernel to carry out the job. To make the transition from user mode to kernel mode and back to user mode as fast and efficient as possible, the kernel is present in all processes' virtual memory address spaces, although it is invisible to these programs. When the kernel is needed, the program makes a system call, the processor switches to kernel mode and enters the kernel. When it is done, the CPU is told to switch back to user mode, and reenter the process. While in user mode, the kernel's code and data remains out of sight but present in the process's page tables.
>
> Think of the kernel as God sitting on a cloud, looking down on Earth. It's there, and no normal being can see it, yet they can pray to it.

---

[7] https://www.theregister.co.uk/2018/01/02/intel_cpu_design_flaw/ (last visited January 4, 2018)

> These KPTI patches move the kernel into a completely separate address space, so it's not just invisible to a running process, it's not even there at all. Really, this shouldn't be needed, but clearly there is a flaw in Intel's silicon that allows kernel access protections to be bypassed in some way.
>
> ***The downside to this separation is that it is relatively expensive, time wise, to keep switching between two separate address spaces for every system call and for every interrupt from the hardware. These context switches do not happen instantly, and they force the processor to dump cached data and reload information from memory. This increases the kernel's overhead, and slows down the computer***.

(Emphasis supplied).

Your Intel-powered machine will run slower as a result.[8]

**The Spectre vulnerability**:

27. Spectre is a name covering two different exploitation techniques known as CVE-2017-5753 or "bounds check bypass," and CVE-2017-5715 or "branch target injection." These techniques potentially make items in kernel memory available to user processes by taking advantage of a delay in the time it may take the CPU to check the validity of a memory access call.

28. Spectre risk is similarly dangerous to users.  As explained by researchers at the Graz University of Technology:

> Spectre breaks the isolation between different applications. It allows an attacker to trick error-free programs, which follow best practices, into leaking their secrets. In fact, the safety checks of said best practices actually increase the attack surface and may make applications more susceptible to Spectre.
>
> Spectre is harder to exploit than Meltdown, but it is also harder to mitigate. However, it is possible to prevent specific known exploits based on Spectre through software patches.[9]

29. As with Meltdown, it is unlikely that an antivirus program will detect attacks through Spectre.

///

///

---

[8]   *Id.*

[9]   https://spectreattack.com/#faq-fix

**Intel's Knowledge of the Defects**:

30. Intel has long known of the design defect and the potential security risks (including the Meltdown and Spectre vulnerabilities), but has done nothing about them. On January 4, 2018, *Morningstar* reported, in an article titled, "Intel Struggled With Securities Flaws for Months," that:

> On June 1 last year, a member of Google's Project Zero security team notified Intel and other chip makers of the vulnerabilities. Even with the lead time, Intel and others are still trying to plug the security gaps. One issue is getting security updates to billions of devices. Another is that some security patches could slow performance, as the flaws affect chip features designed to speed up processors.[10]

31. As reported in *The Washington Post*, Intel has now acknowledged receiving the above information about the security risks from Google's Project Zero.[11]

32. Based on what Intel knew of the design defect, its CEO, Brian Krzanich, sold $24 million of company stock – the maximum amount allowed by employment agreement – in October 2017.

33. In fact, Intel either knew, or should have known, of these defects at least throughout the Class Period (defined below). Had Intel been performing proper tests and security checks of its processors, the vulnerabilities would have been evident. No fewer than three independent teams working separately (teams from Google Project Zero, Cyberus Technology, and the Graz University of Technology) were able to discover Meltdown and two independent teams (from Google Project Zero and a group of universities) were able to discover Spectre.[12] Intel, with its access to proprietary information, was in a much better position to discover the flaws than independent researchers. And, as the defective processors were at the center of its business, it had both the obligation and motivation to do so.

34. Nonetheless, Intel has continued to sell the defective Intel Processors to this day. As a result, Plaintiffs and Class members have been needlessly harmed.

---

[10] http://news.morningstar.com/all/dow-jones/us-markets/201801049039/intel-wrestled-with-chip-flaws-for-months.aspx (last visited January 4, 2018).

[11] https://www.washingtonpost.com/news/the-switch/wp/2018/01/04/tech-companies-work-to-patch-major-computer-vulnerabilities-meltdown-and-spectre/?utm_term=.6ae0c9991e99

[12] https://spectreattack.com/#faq-fix

CLASS ACTION COMPLAINT
- 8 -

**Intel Acknowledges that Its Processors Are Defective**

35. Intel has admitted that its processors have significant security vulnerabilities, that it is not, itself, able to provide patches that fully remedy those vulnerabilities, and that the patches offered may slow processors down (though it downplays both its responsibility and the slowing effect). On January 3, 2017, Intel issued a press release stating that:

> Intel and other technology companies have been made aware of new security research describing software analysis methods that, when used for malicious purposes, have the potential to improperly gather sensitive data from computing devices that are operating as designed. …
>
> Recent reports that these exploits are caused by a "bug" or a "flaw" and are unique to Intel products are incorrect. Based on the analysis to date, many types of computing devices — with many different vendors' processors and operating systems — are susceptible to these exploits.
>
> Intel is committed to product and customer security and is working closely with many other technology companies, including AMD, ARM Holdings and several operating system vendors, to develop an industry-wide approach to resolve this issue promptly and constructively. Intel has begun providing software and firmware updates to mitigate these exploits. Contrary to some reports, any performance impacts are workload- dependent, and, for the average computer user, should not be significant and will be mitigated over time.
>
> . . .
>
> Check with your operating system vendor or system manufacturer and apply any available updates as soon as they are available. Following good security practices that protect against malware in general will also help protect against possible exploitation until updates can be applied.

36. The position in which this leaves consumers is clear. They have processors that are slower and more vulnerable than what consumers bargained for. They have processors that are not adequate for their ordinary purpose. Plaintiffs and other Class members would not have purchased their processors, or would not have paid as much for them, had they known the truth.

## CLASS ALLEGATIONS

37. Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed classes are defined under Federal Rules of Civil Procedure 23(b)(2) and (3).

Plaintiffs propose to act as representatives of the following Nationwide Class comprised of all persons who purchased or leased Intel Processors or products containing Intel Processors in the United States at any time since 2008 (the "Class Period")

38. Plaintiffs also bring this action on behalf of two sub-classes: the Alaska Sub-Class, comprised of all Class members who resided in Alaska when they purchased or leased Intel Processors or products containing Intel Processers or who purchased or leased those products in Alaska; and the Colorado Sub-Class, comprised of all Class members who resided in Colorado when they purchased or leased Intel Processors or products containing Intel Processers or who purchased or leased those products in Colorado.  Collectively, the Class and the Sub-Classes are referred to as the "Classes".

39. Excluded from the Classes are Intel; any person, firm, trust, corporation, officer, director, or other individual or entity in which Intel has a controlling interest or which is related to or affiliated with Intel; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of each such excluded party.

40. The Classes for whose benefit this action is brought are so numerous and geographically dispersed that joinder of all members is impractical.

41. Plaintiffs are unable to state the exact number of members of the Classes without discovery of Intel's records but, on information and belief, allege that the Class members number in the millions.

42. Plaintiffs are typical of the members of the Classes in that their claims are based on the exact same facts and legal theories as the claims of all other Class members.

43. There are questions of law and fact common to the Classes which predominate over any questions affecting only individual members.  The common questions of law and fact affecting the rights of all members of the Classes include the following:

    a. whether Defendant's Intel Processors are defective;

    b. whether Defendant's Intel Processors contain the Meltdown risk;

    c. whether Defendant's Intel Processors contain the Spectre risk;

    d. whether the remedies for either defect slow down processors;

  e. whether any slowdown is material;

  f. whether the remedies for either defect are effective;

  g. when Defendant knew of the defects;

  h. whether Defendant violated consumer protection laws by selling or leasing the defective Intel Processors;

  i. whether Defendant breached any warranties in connection with the sale or lease of the Intel Processors;

  j. whether Plaintiffs are entitled to injunctive relief; and

  k. the appropriate measure and amount of compensation for Plaintiffs and the Classes.

44. Each of these common questions of law and fact is identical for each and every member of the Classes.

45. Plaintiffs are members of the Classes they seek to represent, and their claims arise from the same factual and legal basis as those of the other members of the Classes. Plaintiffs assert the same legal theories as do all members of the Classes.

46. Plaintiffs will thoroughly and adequately protect the interests of the Classes, having obtained qualified and competent legal counsel to represent themselves and those similarly situated.

47. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources, and as such prosecution on a Class basis is superior to other methods of adjudication.

### COUNT I
### Breach of Implied Warranty
### (Individually and Behalf of the Classes)

48. Plaintiffs incorporate by reference paragraphs 1 through 47 above as if fully set forth herein.

49. This claim is asserted on behalf of Plaintiffs and the Classes.

50. Defendant is a "merchant" and the Intel Processors are "goods" as defined under the Uniform Commercial Code.

51. Pursuant to U.C.C. § 2-314, an implied warranty that goods are merchantable is implied in every contract for a sale of goods. Defendant impliedly warranted that the Intel Processors were of a merchantable quality.

52. Defendant breached the implied warranty of merchantability because the Intel Processors were and are not of a merchantable quality due to the Defects, and the associated problems and failures in the Intel Processors caused by the Defects.

53. Plaintiffs' and each Class member's interactions with Defendant suffice to create privity of contract between Plaintiffs and all other members of the Classes, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the absent Class members are intended third-party beneficiaries of contracts between Defendant and its resellers, authorized dealers, and specifically, of Defendant's implied warranties.

54. Defendant's resellers, dealers, and distributors are intermediaries between Defendant and consumers. These intermediaries sell Intel Processors to consumers and are not, themselves, consumers of Intel Processors, and therefore have no rights against Defendant with respect to Plaintiffs' and all other Class members' purchases of Intel Processors. Defendant's warranties were designed to influence of consumers who purchased Intel Processors, including products that contain them.

**COUNT II**
**Breach of Express Warranty**
**(On Behalf of Plaintiffs and the Classes)**

55. Plaintiffs incorporate by reference paragraphs 1 through 47 above as if fully set forth herein.

56. This claim is asserted individually and on behalf of Plaintiffs and the Classes.

57. Pursuant to U.C.C. § 2-313, an affirmation of fact, promise, or description made by the seller to the buyer which relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation, promise, or description.

58. Defendant is a "merchant" and the Intel Processors are "goods" within the meaning of the U.C.C.

59. Defendant represented that its processors were of particular speeds, which, after implementation of a patch necessary to protect against a security risk, they are not.

60. As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and all other Class members have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including but not limited to repair and replacement costs, monetary losses associated with the slow processor speed, diminished value of their computer devices, and loss of use of or access to their computer devices.

## COUNT III
## NEGLIGENCE
**(Individually and On Behalf of the Classes)**

61. Plaintiffs incorporate by reference paragraphs 1 through 47 above as if fully set forth herein.

62. This claim is asserted individually and on behalf of Plaintiffs and the Classes.

63. Defendant Intel owed a duty of care to Plaintiffs and Class members, arising from the sensitivity of the information stored on computers and the foreseeability of the Intel Processor's data safety shortcomings resulting in an intrusion, to exercise reasonable care in safeguarding sensitive personal information. It also had a duty of care to ensure that its processors would function at the quality and speed levels it represented. This duty included, among other things, designing, maintaining, monitoring, and testing its processors, to ensure that Class members' data and computers were adequately secured from and that the processors would function as promised.

64. Defendant Intel owed a duty to Class members to implement processes that would detect a major defect in a timely manner.

65. Defendant Intel also owed a duty to disclose the material fact that Intel Processors were defective.

66. But for Intel's breach of its duties, Class members would not have purchased the defective Intel Processors or would not have paid as much for them as they did, and would not have been exposed to security risks and processor slowdowns.

67. Plaintiffs and all other Class members were foreseeable victims of Defendant's wrongdoing. Intel knew or should have known that Intel Processors would cause damages to Class members.

68. The damages to Plaintiffs and the Class members were a proximate, reasonably foreseeable result of Defendant's breaches of its duties.

69. Therefore, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

## COUNT IV
**Unjust Enrichment**
**(Individually and on Behalf of the Classes)**

70. Plaintiffs incorporate by reference paragraphs 1 through 47 above as if fully set forth herein.

71. This claim is asserted individually and on behalf of Plaintiffs and the Classes.

72. Plaintiffs make this claim in the alternative to the warranty claims set forth above.

73. As a result of Defendant's material deceptive advertising, marketing and/or sale of its Intel Processors, Defendant was enriched at the expense of Plaintiffs and all other Nationwide Class members through their purchase of the Intel Processors, because the Intel Processors did not provide the benefits as represented.

74. There is privity between Defendant on the one hand and Plaintiffs and all other members of the Classes on the other hand because Defendant for the purchasers of its processors to be consumers, like Plaintiffs and the Class Members.

75. Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits it received from Plaintiffs and the Class as the result of its unfair and deceptive practices. Thus, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the other members of the Classes.

///

///

///

///

## COUNT V
### Alaska Unfair Trade Practices and Consumer Protection Act
### Alaska Stat. § 45.50.471, *et seq*
### (By Plaintiff Rinn Individually and on behalf of the Alaska Sub-Class)

76. Plaintiff Rinn incorporates by reference paragraphs 1 through 47 above as if fully set forth herein.

77. Plaintiff Rinn brings this action individually and on behalf of the Alaska Sub-Class.

78. At all relevant times, Intel was prohibited by the Alaska Unfair Trade Practices and Consumer Protection Act ("AUTPA"), Alaska Stat. § 45.50.471, *et seq.*, from engaging in unfair or deceptive acts and/or practices in the conduct of any trade or commerce.

79. AUTPA Section 45.50.471(b) prohibits:

> (6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. . . .
>
> (8) advertising goods or services with intent not to sell them as advertised. . . .
>
> (11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services. . . .
>
> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged . . . .

80. Based on the conduct alleged in this Complaint, Intel engaged in unfair and deceptive acts or practices in violation of AUTPA. In the course of its business, Intel sold defective Intel Processors, representing them as having a particular quality which they did not, and with the intent not to sell them as advertised. It intended consumers, including Class members, to be the ultimate purchasers of the Intel Processors. It sold them without disclosing their true condition, the security flaws to which they exposed consumers or the significant detriment to processor performance that remedies required to address security risk would cause.

81. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, misrepresentations or omissions of material facts when it knowingly engaged in the above described actions.

82. At all relevant times, Intel knew or should have known that the Intel Processors were defective, that the Intel Processors pose a serious risk to customers, exposing their personal sensitive data to malicious interference, and that addressing the security risk would require significantly reducing performance of the process.

83. Despite this knowledge, Intel represented that the Intel Processors had certain speeds, which, unbeknownst to consumers, after addressing security risks, they would not maintain.

84. Processor speed is a critical feature for many purchasers, and indeed, is often listed among the top features on any product specification sheet. Intel's misrepresentations and omissions were material to reasonable consumers.

85. Intel's acts and practices caused substantial injury to Plaintiff Rinn and all other Alaska Sub-Class members because: (a) they would not have purchased the Intel Processors, or would not have purchased them on the same terms, if the true facts had been known; and (b) they paid a price premium due to false representations about the Intel Processors.

86. Intel's unfair and/or deceptive practices directly, foreseeably, and proximately caused Plaintiff Rinn and the Alaska Sub-Class to suffer an ascertainable loss, including overpaying for the Intel Processors, including overpaying for the processors, being exposed to security risks, and suffering processer slow down.

87. As a result of Intel's violation of AUTPA, Plaintiff Rinn and the other Alaska Sub-Class members should be awarded damages, including punitive damages, in an amount to be determined at trial pursuant to Alaska Sta. Ann § 45.50.531.

88. Concurrently with the filing of this Complaint, on January 5, 2018, Plaintiffs sent a letter complying with Alaska Stat. § 45.40531(c) to the Alaska Attorney General.

///

///

///

# COUNT VI

**Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq*.**
**(By Plaintiff Cappelli Individually and on Behalf of the Colorado Sub-Class)**

89. Plaintiff Cappelli incorporates by reference paragraphs 1 through 47 above as if fully set forth herein.

90. Plaintiff Cappelli brings this action individually and on behalf of the Colorado Sub-Class.

91. Chapter 6-1-101 of the Colorado Consumer Protection Act ("CCPA") generally governs deceptive trade practices within the State of Colorado. Colo. Rev. Stat. § 6-1-105.

92. The CCPA governs trade practices affecting the sale of goods, services, or property. Colo. Rev. Stat. § 6-1-105.

93. The CCPA outlaws "represent[ing] that goods, food, services, or property are of a particular standard, quality, or grade . . . if he knows or should know that they are of another." Colo. Rev. Stat. § 6-1-105.

94. Plaintiff Cappelli is a consumer within the meaning of the CCPA.

95. Defendant's false and misleading representations and omissions complained of herein are "trade practices" within the meaning of the CCPA.

96. Defendant intended consumers, including Plaintiff Cappelli and all other Colorado Sub-Class members, to be the ultimate purchasers of its processors.

97. Defendant actively misrepresented the quality of the Intel Processors.

98. Defendant's knowing unfair or deceptive acts or practices tended to create a false impression in potential and actual consumers of Intel Processors, and in fact did deceive reasonable consumers, including Plaintiff Cappelli and all other members of the Colorado Sub-Class about the true value of an Intel Processor made by Defendant.

99. Defendant knew or should have known that the falsity of its misrepresentations and the deceptiveness of its omissions.

100. Plaintiff Cappelli and all other members of the Colorado Sub-Class suffered an ascertainable loss caused by Defendant's wrongdoing. Had they been aware of the truth, they would not have purchased the Intel Processors or would have paid less for them. Plaintiff Cappelli

and members of the Colorado Sub-Class did not receive the benefit of their bargain as a result of Defendant's misconduct.

101. Defendant's unlawful acts and practices complained of herein affect the public interest.

102. As a direct and proximate result of Defendant's violations of the CCPA, Plaintiff Cappelli and all other members of the Colorado Sub-Class have suffered injury-in-fact or actual damage.

103. Defendant is liable to Plaintiff Cappelli and the Colorado Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief under Colo. Rev. Stat. § 6-1-113.

**REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant Intel as follows:

a. permanently enjoining Intel from engaging in the wrongful conduct complained of here;

b. certifying the Nationwide Class and appointing Plaintiffs and their Counsel to represent the Nationwide Class and the Alaska Sub-Class and Colorado Sub-Class;

c. awarding actual damages, consequential damages, incidental damages, statutory damages, punitive damages, pre- and post-judgment interest, litigation expenses and court costs in an amount to be determined at trial;

d. awarding Plaintiffs and the Classes their reasonable attorneys' fees and costs; and

e. granting such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

DATED: January 5, 2018              **WOLF HALDENSTEIN ADLER
                                    FREEMAN & HERZ LLP**
                                    RACHELE R. RICKERT

                                    */s/ Rachele R. Rickert*
                                    RACHELE R. RICKERT

CLASS ACTION COMPLAINT
- 18 -

750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
GREGORY M. NESPOLE
JANINE L. POLLACK
RANDALL S. NEWMAN (190547)
KATE M. McGUIRE
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/545-4677

Counsel for Plaintiffs

INTEL:24363

CLASS ACTION COMPLAINT
- 19 -